UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------x

PIERRE JENKINS a/k/a PIERRE
BURTON,

                            Plaintiff,

                    v.

THE CITY OF NEW YORK, NEW YORK
CITY POLICE DEPARTMENT,
DETECTIVE WALTER MACK,
DETECTIVE JEROME PARRINO,
DETECTIVE STEVEN HUNTER, and
DETECTIVE ROBERT SCHULMAN,

                            Defendants.

-----------------------------------------------x

<u>MEMORANDUM
AND ORDER</u>

01-CV-1906 (ILG)

GLASSER, United States District Judge:

      This civil rights action concerns the arrest and prosecution of plaintiff, Pierre
Jenkins a/k/a Pierre Burton ("plaintiff" or "Jenkins"), for several robberies and a
homicide in 1999.  Plaintiff was indicted, incarcerated for nine months and then
released after the charges against him were dismissed.  In this action, he asserts federal
and state constitutional claims and pendent state law claims against the following
defendants:  the City of New York (the "City"), the New York City Police Department
("NYPD"), and individual defendants, detectives Walter Mack ("Mack"), Jerome Parrino
("Parrino"), Steven Hunter ("Hunter") and Robert Schulman ("Schulman").  Pending
before the Court is defendants' motion for summary judgment.

## **FACTS**

      After a contested hearing on February 15, 2000, Judge Michael R. Juviler of the
Kings County Supreme Court made the following findings of fact regarding the
circumstances surrounding plaintiff's arrest and subsequent detention, which this Court

1

regards as definitive for purposes of this motion. On June 21, 1999, Alison Conte was the victim of a carjacking in Brooklyn, New York. During that incident, the perpetrator, who wielded a silver handgun, stole her ring and her red 1992 Honda Civic, which bore the license plate V143AU. <u>See</u> Bruzzese Aff. Ex. O at 219, ln. 20-25. Conte described the perpetrator to police as an African-American male, 5'8" tall, 140 pounds, with short black hair, black eyes and a beard and mustache.

On June 25, 1999, Keith Golden was robbed at gunpoint in Brooklyn by two African-American men who stole his necklace, watch and bracelet. Golden described one man as black, 30 years old, 5'10" tall, 175 pounds, with short black hair. He reported that the other individual was a black man, 30 years old, 6'3" tall, and weighed 200 pounds. Golden told the police that the two individuals fled the scene of the robbery in a maroon Honda bearing the license plate 314VAU.

Three days later, on June 28, 1999, David Diaz was killed by two black males in a schoolyard in Brooklyn. One eyewitness, Jason Chambers, told the police on June 29, 1999, that he saw two individuals, one of whom took out a small silver handgun while the other pulled a chain from Diaz's neck. Chambers described the first individual as male, black, approximately 5'9" to 5'10" tall with dark skin, a light beard and a slim build. He reported that the second individual was male, black, approximately 5'11" to 6' tall, weighed around 200 pounds and had short hair. A second witness to the shooting, George Richards, described one of the perpetrators as a 30-year-old black male, six feet tall and thin. He further stated that this man arrived at and left the scene in a red car, which he thought was a Honda. A third witness, Ivan Cueves, described one of the perpetrators as a black male, 33 to 35 years old, six feet tall, 150 pounds, with dark,

short hair. Cueves reported that the second perpetrator was a black male, 5'10" tall, and 150 pounds. He described the car in which the two men fled as a red vehicle with a New York license plate that began with either "T14" or "714."

On July 5, 1999, Vinette Tummings reported that she was robbed in a similar area of Brooklyn by an African-American man with a silver handgun. Tummings described the perpetrator as a black male, 5'4" tall, 20 years old, with short black hair and a beard. She also reported that he fled in a red Honda bearing the license plate V143AU.

On July 8, 1999, Wilfredo Montes reported to the NYPD that he was robbed at gunpoint in Brooklyn by an African-American man who stole his necklace and his girlfriend's jewelry. He described the perpetrator as a black male, in his late 20s or early 30s, 5'8" to 5'9" tall, approximately 150 pounds, with a thin mustache and a black beard. Montes reported that the perpetrator fled in a red Honda with a license plate that included "V1436."

On July 9, 1999, Ellen Houston was the victim of a robbery in Brooklyn by two men, one of whom wielded a small silver gun. The men stole her purse and her rings and then fled in a red Honda Civic. She described one perpetrator as black, 16 years old, 5'7" tall, 150 pounds, with short brown hair and brown eyes and the other as a black man, 16 years old, 5'8" tall, 160 pounds with black hair and brown eyes.

On July 12, 1999, Nancy and Judy Lorrient were the victims of an attempted car-jacking by two men, one of whom had a silver gun. Nancy Lorrient described one perpetrator as a black male in his twenties, 5'6" to 5'8" tall and the other as a black male in his twenties, 5'6" to 5'8" tall, with dreadlocks and a short thin beard.

The NYPD conducted investigations into the various crimes. Detective Mack investigated the homicide of Diaz and Detective Parrino investigated the series of robberies, termed "Robbery Pattern 101." On July 13, 1999, the police recovered Conte's car in Brooklyn, New York. They lifted a fingerprint from the car, which belonged to Derrick Blyther ("Blyther"). They also found Houston's stolen property, which she identified as hers on July 15. Once they had Blyther's fingerprint, the police were able to determine his address and obtain a photograph of him. They included that photograph in a photo array and, on July 14, 1999, Montes positively identified Blyther as the individual who robbed him on July 8, 1999.

At around 5:00 a.m. on July 15, 1999, detectives Hunter and Schulman and non-parties Detective Ferro and Sargent Amodeo, wearing plainclothes, went with members of the Brooklyn Robbery Squad to Blyther's apartment at 1280 St. John's Place in Brooklyn to arrest him without a warrant. The detectives knocked on the door of the apartment and announced "Police." No one answered and the officers then heard a commotion inside the apartment. The door was opened from within the apartment and a man ran into the hallway. That man was Blyther, whose photograph one of the officers present had examined. The detectives tackled and handcuffed him. Immediately thereafter, another man – the plaintiff in this case – came running out. The officers grabbed plaintiff, arrested him and then took him and Blyther in custody to the precinct.

With Blyther and plaintiff in custody, Detective Mack conducted a lineup on July 15, which included Blyther and five fillers. The three witnesses to the shooting of Diaz viewed the lineups. Chambers and Cueves did not identify anyone in the lineup, but, when Richards viewed the lineup at 10:15 a.m, he identified Blyther as the man who

came into the schoolyard when Diaz was killed. Detective Mack conducted another lineup, which included plaintiff and five fillers. At 10:30 a.m., Chambers viewed the lineup and identified plaintiff as the man with the gun in the schoolyard. Cueves and Richards separately viewed that lineup, but identified no one.

Also on July 15, the detectives investigating Robbery Pattern 101 conducted lineups that included Blyther and plaintiff. Several of the witnesses who viewed Blyther's lineup identified him as the man who robbed them. At 11:00 a.m., Nancy Lorrient viewed a lineup that included plaintiff, but did not identify him as having been involved in the attempted carjacking. A few minutes later, Judy Lorrient viewed plaintiff's lineup, but she, too, made no identification. At 6:00 p.m. that day, the police conducted another set of lineups. In one lineup, Tummings identified plaintiff as the person who robbed her. Shortly thereafter, at 6:20, Golden also identified plaintiff in a lineup. At around 6:30, Houston viewed a lineup that included plaintiff, but did not make an identification.

On July 15, 1999, Mack charged plaintiff and Blyther with Murder in the First Degree, Robbery in the First Degree and Criminal Possession of a Weapon in the Second Degree in connection with Diaz's homicide. Def. 56.1 Statement ¶ 100. On or about July 16, 1999, plaintiff was arraigned on the following counts: Murder in the Second Degree in violation of N.Y. Penal Law § 125.25(1); Murder in the Second Degree in violation of N.Y. Penal Law § 125.25(2); Murder in the Second Degree in violation of N.Y. Penal Law § 125.25(3); Murder in the First Degree in violation of N.Y. Penal Law § 125.27; Robbery in the First Degree in violation of N.Y. Penal Law § 160.15; and Criminal Possession of a Weapon in the Second Degree in violation of N.Y. Penal Law §

265.03 in connection with Diaz's murder.  See id. ¶ 108.

Assistant District Attorney Stan Irvin ("A.D.A. Irvin") determined that there was sufficient evidence to prosecute plaintiff on the robbery and homicide charges based on his review of the police reports and witnesses' accounts of the crimes.  Id. ¶ 112.  On July 19, 1999, A.D.A. Irvin presented Diaz's homicide to the Grand Jury, which heard testimony from, among others, Chambers and detectives Mack and Parrino.  Id. ¶ 116. On July 28, 1999, the Grand Jury returned a True Bill with respect to the homicide charge and plaintiff was indicted on one count of Murder in the First Degree, three counts of Murder in the Second Degree, four counts of Robbery in the First Degree, two counts of Robbery in the Second Degree, two counts of Criminal Possession of a Weapon in the Second Degree and two counts of Criminal Possession of a Weapon in the Third Degree.  Id. ¶ 120.

On July 22, 1999, A.D.A. Irvin presented some of the robberies to a second Grand Jury.  On August 12, 1999, plaintiff was indicted on four counts of Robbery in the First Degree, two counts of Robbery in the Second Degree, one count of Attempted Robbery in the First Degree, one count of Attempted Robbery in the Second Degree and several counts of Grand Larceny, which Judge Juviler subsequently reduced to two counts of petit larceny.  Id. ¶¶ 124, 127.

On February 15, 2000, Judge Juviler held a hearing concerning various evidentiary motions made by Blyther and plaintiff.  In his decision, which he read into the record on February 17, 2000, Judge Juviler denied both defendants' Wade motions to suppress the identifications, finding that "all of the lineups in both investigations ... were free from undue suggestion...."  Bruzzese Aff. Ex. O at 235, ln. 13-15.  However, he

granted plaintiff's <u>Dunaway</u> motion to suppress the lineup identifications as the products of an unlawful arrest without probable cause.  <u>Id.</u> at 219, ln. 11-14.

On February 27, 2000, in a "sit-down" that A.D.A. Irvin conducted with Blyther, his attorney and detectives Mack and Parrino, Blyther inculpated another individual, Harvey Dixon, in the crimes and exculpated plaintiff.  Def. 56.1 Statement ¶¶ 132, 133. Jason Chambers subsequently recanted his lineup identification of plaintiff and identified Harvey Dixon as the individual involved in the homicide.  <u>Id.</u> ¶ 135. Thereafter, the Kings County District Attorney's Office dropped the homicide charges against plaintiff.  On April 6, 2000, after the second phase of the hearing on plaintiff's motion to suppress,[1] Judge Juviler found that the People failed to satisfy their burden to show that in-court identifications would be derived from a source independent of the lineup identifications by Tummings and Golden.  <u>See</u> Bruzzese Aff. Ex. S.  Plaintiff was released from custody that day and the indictment was dismissed on May 12, 2000.  Def. 56.1 Statement ¶¶ 145-46.

On March 24, 2001, plaintiff commenced this action.  In his complaint, plaintiff asserts various federal and state law claims arising from his alleged unlawful arrest and imprisonment and seeks damages for lost wages, physical and mental pain, and grievous emotional distress, in addition to punitive damages and attorney's fees.  Pending before the Court is defendants' motion for summary judgment.

---

[1] In his ruling on the February 15, 2000 suppression hearing, Judge Juviler stated, "the People, after the trial of Mr. Blyther, can have an opportunity, if necessary, to show by clear and convincing evidence that a courtroom identification by these three witnesses would have a source independent of the lineup."  <u>See</u> Bruzzese Aff. Ex. O at 238, ln. 14-19.

## DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment is precluded only where the factual issue is genuine, which means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In order to survive a motion for summary judgment, "the opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To that end, the non-moving party "may not rest upon the mere allegations or denials" in its pleadings; rather, it "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). When evaluating a motion for summary judgment, "the inferences to be drawn from the underlying facts … must be viewed in the light most favorable to the party opposing the motion." Matsushita, 475 U.S. at 587. Guided by these principles, the Court turns to the parties' arguments in this case.

## I. False Arrest Claims

### A. The period from detention on reasonable suspicion to the lineups

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. Am. IV. Plaintiff asserts his causes of action under 42 U.S.C. § 1983, alleging that the individual police officers acting under color of state law deprived him of his civil

rights guaranteed by the U.S. Constitution when they arrested him without probable cause. Plaintiff also asserts causes of action for false arrest under state law.[2] He alleges that he was taken in custody from 1280 St. John's Place to the police precinct, that he was detained at the precinct without probable cause before the lineups were conducted and that this constituted an unreasonable seizure under the Fourth Amendment. See Compl. ¶¶ 24-27.

Under New York law, the elements of a false arrest or false imprisonment claim are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995). See also Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). "The elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under New York law." Hygh v. Jacobs, 961 F.2d 359, 366 (2d Cir. 1992).[3]

The only disputed element of the claim is whether the arrest or confinement of plaintiff was privileged. Such justification (which provides a complete defense to liability) may be established by evidence that the officers had probable cause to make

---

[2] The Court notes at the outset that plaintiff's complaint is far from a model of clarity. He asserts 15 causes of action, none of which identifies which law or statute it is alleged to violate. The Court has attempted to do so in making its determinations.

[3] Plaintiff's complaint asserts various claims for false arrest under New York common law, Article 1, § 12 of the state constitution and the U.S. Constitution. See Count One, ¶ 27; Count Three, ¶ 46; Count Four, ¶ 51; Count Six, ¶ 60; Count Seven, ¶ 63; Count Eight, ¶ 65; Count Twelve, ¶ 92. In view of the similarity of the federal and state law causes of action, the Court will treat those claims together. Additionally, plaintiff asserts claims for false imprisonment. See id. "The common law tort of false arrest is a species of false imprisonment." Singer, 63 F.3d at 118. Thus, the Court will analyze claims for false imprisonment along with those for false arrest.

the arrest. Where, as here, there is a warrantless arrest, "the officer acted extrajudicially and the presumption arises that such an arrest and imprisonment are unlawful." Broughton v. New York, 37 N.Y.2d 451, 458 (1975). The defendant bears the burden of proving that probable cause existed. See id. "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Weyant, 101 F.3d at 852.

In this case, based on testimony presented at the suppression hearing, Judge Juviler found that

> there was no probable cause to arrest Mr. Burton [a/k/a Jenkins]. The police had reasonable suspicion to detain him for investigation, at least at the scene of his apprehension. His attempted flight and his being in the presence of a person [Blyther], who, it appeared clearly, was a robber in a number of cases, some of which involved two robbers, provided reasonable suspicion. But the police did more than detain Mr. Burton. They took him in custody to the precinct, and he was not identified as having taken part in any of the aforementioned crimes until Ms. Tummings identified him in a lineup at six o'clock, long past the time of any reasonable detention of a person, on reasonable suspicion, even if, for the sake of discussion, the police were allowed to detain him at a precinct.

> Indeed, this identification took place eleven hours after he was taken into custody, with no intervening probable cause in his case. The Court, therefore, grants Mr. Burton's motion to suppress the lineup identifications by the witnesses Tummings, Golden and [Chambers] as fruits of an unlawful arrest without probable cause.

> The Court has a correction. It was not eleven hours before the first identification of Mr. Burton; it was five and a half hours. But that is long beyond the time of any reasonable detention that is based only on reasonable suspicion. I am referring to the identification by Mr. Chambers in the lineup conducted by Detective Mack. That identification is also suppressed as the fruit of an unlawful arrest without probable cause.

> Needless to say, the first identification of Mr. Burton could not be used to support

> his continued custody thereafter, or the police would be exploiting the [illegality] of their seizure....

Bruzzese Aff. Ex. O at 236-8.  Judge Juviler thus found that the period during which the plaintiff was detained based only upon reasonable suspicion was excessive and that the "Terry stop" detention was therefore transformed into an "arrest."  That arrest, being based only on reasonable suspicion, was without probable cause and therefore unlawful.  The Court gives preclusive effect to those findings.  See 28 U.S.C. § 1783 ( state court judgments "shall have the same full faith and credit in every court within the United States....").  See also Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984) ("It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.") (citations omitted).  In analogous cases, courts have held that state court rulings granting motions to suppress are final judgments for purposes of collateral estoppel and are therefore preclusive in federal court actions.  See DiGiangiemo v. Regan, 528 F.2d 1262, 1265, 1266 (2d Cir. 1975) (holding that the county judge's granting of defendant's motion to suppress in the earlier criminal prosecution constituted a final judgment given).  See also Owens v. Treder, 873 F.2d 604 (2d Cir. 1989) (citing DiGiangiemo favorably for this proposition); People v. Plevy, 52 N.Y.2d 58, 67 (1980) (Fuchsberg, J., concurring) (same).

In the absence of justification for the arrest, the Court denies defendants' motion for summary judgment as to plaintiff's false arrest and false imprisonment claims to the extent he seeks damages for his detention between the initial seizure based on reasonable suspicion and the first lineup identification.  See Compl. Counts One, Three,

Four, Six, Seven, Eight, and Twelve. The Court will discuss below the defendants'
assertion in their motion for summary judgment that the individual defendants are
entitled to qualified immunity from liability for their actions.

**B.    Post-Lineup Detention**

In addition to alleging injury based on his detention before the lineups, plaintiff
seeks to recover for the nine months during which he was imprisoned. <u>Id.</u> ¶¶ 24, 30. As
mentioned above, Judge Juviler found that the lineups were properly conducted and
free from suggestion and denied plaintiff's motion to suppress on that ground. <u>See</u>
Bruzzese Aff. Ex. O at 235, ln. 12-17. However, having found plaintiff's arrest unlawful,
he then invoked the "fruit of the poisonous tree" rule to suppress the identifications.

It is well settled, however, that the fruit of the poisonous tree doctrine is a rule of
evidence, applicable only in criminal trials and cannot be successfully invoked to
support a § 1983 claim. <u>See</u> <u>Townes v. The City of New York</u>, 176 F.3d 138 (2d Cir.
1999). The invocation of that doctrine in the criminal proceeding to suppress the lineup
identifications is, therefore, of no preclusive effect in this § 1983 action and insofar as
Judge Juviler found that "all the lineups were free from undue suggestion" and denied
the motions to suppress them, that finding similarly will be afforded full faith and credit
here. <u>See</u> 28 U.S.C. § 1738; U.S. Const. Art. IV, § 1.

Having positive identifications of the plaintiff as the perpetrator of the crimes,
the police at that point plainly had probable cause to believe the plaintiff committed the
crimes with which he was thereafter charged and his warrantless detention, <u>i.e.</u>, arrest,
that followed was lawful. Accordingly, defendants' motion is granted as to the portion of
plaintiff's claims seeking damages for his detention after Chambers positively identified

him as the individual involved in Diaz's shooting.

## II. __Malicious Prosecution__

To prevail on a claim for malicious prosecution, a plaintiff must show: "(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice, and (4) the matter terminated in plaintiff's favor." <u>Ricciuti v. N.Y.C. Trans. Auth.</u>, 124 F.3d 123, 130 (2d Cir. 1997). In addition, in order to establish a cause of action for malicious prosecution under § 1983, plaintiff must show that there was "a sufficient post-arraignment liberty restraint to implicate [his] Fourth Amendment rights." <u>Rohman v. New York City Trans. Auth.</u>, 215 F.3d 208, 215 (2d Cir. 2000). <u>See</u> <u>Singer</u>, 63 F.3d at 117 ("the tort of malicious prosecution will implicate post-arraignment deprivations of liberty"). <u>See also</u> <u>Carson v. Lewis</u>, 35 F. Supp. 2d 250, 263 (E.D.N.Y. 1999) ("An indictment is the legal process commencing the prosecution when an arrest is effectuated without a warrant."). A plaintiff may satisfy this requirement by showing "a deprivation of liberty consistent with the concept of 'seizure.'" <u>Id.</u> (citation omitted). In this case, Jenkins' allegations that he was arrested and incarcerated for nine months are sufficient to demonstrate a deprivation of liberty.

The only issue is whether the defendants had probable cause to prosecute plaintiff. "In the context of a malicious prosecution claim, probable cause under New York law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." <u>Lawson v. New York Billiards Corp.</u>, 331 F. Supp. 2d 121, 131 (E.D.N.Y. 2004) (Glasser, J.). <u>See also</u> <u>Meija v. City of New York</u>, 119 F. Supp. 2d

232, 254 (E.D.N.Y. 2000) ("[I]n a malicious prosecution action, the relevant probable cause determination is whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced."). "The existence, or lack, of probable cause is measured as of the time the judicial proceeding is commenced (e.g., the time of the arraignment), not the time of the preceding warrantless arrest." Id. As discussed above, the lineup identifications provided defendants probable cause to detain and prosecute plaintiff.

Moreover, as defendants argue, the existence of probable cause is presumed where, as here, a defendant was indicted by a Grand Jury. See Def. Mem. at 24. "[T]hat presumption may be overcome with evidence that the indictment was secured by fraud, perjury, the suppression of evidence or other bad faith police conduct." Boyd v. City of New York, 336 F.3d 72, 77 (2d Cir. 2003) (plaintiff satisfied his burden at summary judgment stage by presenting evidence that police arrested him, failed to give him Miranda warnings and then extracted an incriminating statement from him, which suggested that officers' testimony that they arrested him after the statement was made was fabricated and indictment was secured by bad faith or perjury). There being no such evidence, plaintiff cannot support his claim of lack of probable cause and summary judgment is therefore granted for defendants as to the malicious prosecution claims.[4]

### III. **Qualified Immunity**

The individual defendants contend that they are entitled to qualified immunity

---

[4]  The Court notes that to the extent plaintiff's twelfth cause of action alleges malicious prosecution under the Fourteenth Amendment, that claim is dismissed.  See Singer, 63 F.3d at 114 ("the Fourteenth Amendment right to substantive due process will not support a federal claim for malicious prosecution").

even if the Court finds that plaintiff's arrest was unlawful.  See Def. Mem. at 41.  "The doctrine of qualified or good faith immunity shields police officers from being subject to personal liability for damages.  The doctrine extends to official conduct that 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Ricciuti, 124 F.3d at 127 (quoting Harlow v. Fitzgerald, 457 U.S. 800 (1982)).  Police officers are entitled to qualified immunity if "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights."  Oliveira v. Mayer, 23 F.3d 642, 648 (2d Cir. 1994).  The Court must first address the following question:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001).  See also Rohman, 215 F.3d at 215.  Here, plaintiff has established a deprivation of his Fourth Amendment rights based on his wrongful arrest.  "The right not to be arrested in the absence of probable cause is undoubtedly well-established."  Oliveira, 23 F.3d at 648.  See also Ricciuti, 124 F.3d at 128 (the right to be free from arrest in the absence of probable cause is a long established constitutional right); Lennon v. Miller, 66 F.3d 416, 423 (2d Cir. 1995) (constitutional right not to be arrested without probable cause is clearly established).

Having found that defendants violated plaintiff's constitutional rights, the Court turns to the next stage of inquiry.  "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action."  Anderson v. Creighton, 483 U.S. 635, 639 (1987).  As in this case, "[i]f an officer arrests the plaintiff

without probable cause, the officer is immune from suit if he can show either that: (i) it was objectively reasonable for him to believe he had probable cause or (ii) officers of reasonable competence could disagree whether probable cause existed." <u>Sulkowska v. City of New York</u>, 129 F. Supp. 2d 274, 293 (S.D.N.Y. 2001) (citing <u>Golino v. City of New Haven</u>, 950 F.2d 864, 870 (2d Cir. 1991)). As an initial matter, although the Court found that plaintiff was arrested without probable cause, this "do[es] not necessarily mean that it would be unreasonable for a jury to conclude it was objectively reasonable for the police to believe that their detention of plaintiff[] was only a <u>Terry</u> stop or that they possessed probable cause to make an arrest." <u>Oliveira</u>, 23 F.3d at 649-50. Police officers are entitled to qualified immunity if they have arguable probable cause to make an arrest; the law does not require them to have actual probable cause. "Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question <u>could</u> have reasonably believed that probable cause existed in the light of well established law." <u>Cerrone v. Brown</u>, 246 F.3d 194, 202-3 (2d Cir. 2001) (internal quotations and citation omitted) (emphasis in original).

Defendants contend that it was objectively reasonable for them to believe they had probable cause to arrest and detain plaintiff in view of the information they possessed at that time. <u>See</u> Def. Mem. at 46-48. The Court agrees. When they arrested plaintiff, the officers knew that a second African-American man was alleged to have been involved in some of the incidents in Robbery Pattern 101 and Diaz's homicide. The officers were in possession of Conte's stolen red Honda on which they discovered Blyther's fingerprints. When the officers encountered plaintiff at 1280 St. John's Place,

he was in the presence of Blyther, a known suspect in the crimes, and he generally matched the complainants' descriptions of the second perpetrator.  See id. at 42-3.  These facts permitted the officers to make the reasonable inference that plaintiff was involved in the crimes for which they set out to arrest Blyther.  See Cerrone, 246 F.3d at 203 ("Police officers are entitled to draw reasonable inferences from the facts they possess at the time of a seizure based upon their own experiences.").  Furthermore, after the police identified themselves and apprehended Blyther, plaintiff fled from Blyther's apartment.  A suspect's flight may provide reasonable suspicion that criminal activity is afoot.  See Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000).  Thus, the officers could have reasonably believed that they were justified in detaining plaintiff after he ran out of the apartment.  Cf. Oliveira, 23 F.3d at 649 n.3 (reversing directed verdict denying qualified immunity where, among other reasons, a reasonable jury could conclude that it was objectively reasonable for the officers to believe they were conducting a Terry stop given that they detained the suspects for 20 minutes and acted quickly to verify whether a crime occurred, despite the court's finding that the excessive detention constituted an arrest).

Moreover, the officers could have reasonably believed that they lawfully detained plaintiff at the precinct for five hours until they organized the lineups and gathered witnesses to view them.  A fortiori, once Chambers, Golden and Tummings positively identified Jenkins, the officers "could have reasonably believed that probable cause existed" to arrest and detain him.  See Cerrone, 246 F.3d at 202-3.  Accordingly, the Court concludes that the individual defendants are entitled to qualified immunity from personal liability.

## IV.    Liability of the City of New York

In his ninth cause of action, plaintiff alleges that the City, through its agency, the NYPD, failed to train and adequately supervise its police officers regarding search and seizure procedures.  Compl. ¶ 70.  Plaintiff also alleges that the City failed to implement a policy requiring its officers to more thoroughly investigate the justification for detaining individuals.  Id. ¶ 71.

To the extent that plaintiff asserts this cause of action under § 1983, he must show that the City itself caused the constitutional violations because, as discussed above, personal involvement is required for liability to be imposed under that section.  For that reason, liability under § 1983 cannot be predicated on a theory of respondeat superior.  See Erwin v. Russi, 1998 WL 474096, at *5 (S.D.N.Y. Aug. 11, 1998) (citing Monell v. Dep't of Social Servs. of the City of New York, 436 U.S. 658, 691 (1978)).  Instead, plaintiff must establish "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  Wray v. City of New York, 340 F. Supp. 2d 291, 303 (E.D.N.Y. 2004) (citation and internal quotations omitted).  A city's policy or custom is actionable under § 1983 only where its failure to train or supervise amounts to "deliberate indifference" to the rights of individuals.  Id.  To meet this standard, a plaintiff must show that (1) a policymaker knows that employees will confront a given situation, (2) the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or there is a history of employees mishandling the situation, and (3) the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."  Id. at 303-4 (citation and internal quotations omitted).  Plaintiff argues that he was subjected to

unduly suggestive lineups due to the City's failure to train its police officers, which constitutes a policy or custom for which the City can be held liable under § 1983.  See Pl. Opp. at 40.  In his ruling on plaintiff's motion to suppress, Judge Juviler found that all the lineups, including those which produced the positive identifications of plaintiff, were fair and free from suggestion.  See Bruzzese Aff. Ex. O at 235, ln. 12-17.  Accordingly, plaintiff has not presented any evidence sufficient to raise a genuine issue of material fact as to whether the City failed to train or supervise its employees in identification procedures with deliberate indifference to his rights.  The Court therefore grants summary judgment in favor of defendants as to § 1983 claims against the City premised on supervisory liability.[5]

## V.  <u>New York City Police Department</u>

Defendants argue correctly that the NYPD is a non-suable agency of the City.  See Def. Mem. at 52.  See <u>Wray</u>, 340 F. Supp. 2d at 303 (citing NYC Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law.")).  Accordingly, all claims against the NYPD are dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court:  (1) denies defendants' motion for summary judgment as to plaintiff's false arrest and false imprisonment claims to the extent he seeks damages for his detention between his initial seizure and the first lineup identification; (2) grants summary judgment for defendants as to plaintiff's claims

---

[5]  The Court notes that plaintiff's eleventh cause of action also relates to the City's alleged failure to supervise.  To the extent plaintiff asserts this cause of action pursuant to § 1983 it is dismissed for the reasons stated above with respect to Count Nine.

concerning his detention after the lineup identifications; (3) grants summary judgment in favor of defendants as to plaintiff's malicious prosecution claims; (4) grants summary judgment in favor of the individual defendants' qualified immunity; (5) grants summary judgment in favor of defendants as to claims against the City pursuant to § 1983; and (6) dismisses all claims against the NYPD. The Court has considered all of plaintiff's remaining claims and finds that he has failed to show the existence of any genuine issue of material fact thus entitling defendants to summary judgment. The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated: December 8, 2005
        Brooklyn, New York

                                    S/ _____
                                    I. Leo Glasser
                                    United States District Judge

Copies of the foregoing were sent on this day to:

Robert Gerard Androsiglio
Radna & Androsiglio
67 Wall Street, 22nd Floor
New York, NY 10005

Sheryl Ann Bruzzese
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007